UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WILLIAM SOLANO,  CASE NO.

    Plaintiff,

vs.

OAKLEY INC. A WA CORPORATION,
a Foreign For Profit Corporation,

    Defendant.
_____/

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND**

Plaintiff, WILLIAM SOLANO, through undersigned counsel, sues Defendant, Oakley Inc. a WA Corporation, a Foreign For Profit Corporation (hereinafter referred to as "Oakley"), for declaratory and injunctive relief, and damages, and alleges as follows:

1) This action is brought under Title III of the Americans With Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

2) This action is also brought pursuant to 28 C.F.R. Part 36.

3) This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

4) Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

5) Plaintiff is sui juris, and he is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

6) Defendant, Oakley is a foreign corporation authorized to do business and doing business in the State of Florida.

7) Defendant, Oakley owns and operates retail stores that sell men's and women's sunglasses, eyeglasses, goggles, clothing, accessories, and custom sunglasses. There are retail locations in Miami-Dade County.

8) Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9) Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase a cleaner kit, 6 panel reflective hat, and body big bumbag.

10) Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer. The computer is Plaintiff's personal property, and a claim for trespass attached to same.

11) The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

12) The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

13) Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

14) Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

15) At all relevant times, Plaintiff is and was visually impaired and permanent, incurable Rhegmatogenous Retinal Detachment in his left eye and debilitating Glaucoma in his right eye.

16) Plaintiff's visual impairment interferes with his day-to-day activities and causes limitations in visualizing his environment. As such, Plaintiff is a member of a protected class

under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

17)    Plaintiff regularly uses the computer, but he needs the assistance of special software for visually impaired persons.  The software that he uses is screen reader software that is readily available commercially.

18)    Defendant is a private entity which owns and operates retail locations.  The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

19)    Defendant's website is a place of public accommodation per 42 U.S.C. Section 12181(7)(E) because it's an extension of Defendant's brick and mortar stores.  The public is able to locate the Defendant's retail stores and allows consumers to purchase men's and women's sunglasses, eyeglasses, goggles, clothing, accessories, and custom sunglasses, sale items, view items available at defendant's stores, create an online account to receive special offers and rewards, sign up for defendant's newsletter, view collections, limited edition items, collaborative items, and start an online chat with defendant's customer service representatives.

20)    Since the Defendant's website is a public accommodation, it must comply with the requirements of the ADA.  The website cannot discriminate against individuals with disabilities.

21)    Plaintiff is a customer of Defendant who is and was interested in purchasing a cleaner kit, 6 panel reflective hat, and body big bumbag through Defendant's website and at Defendant's stores and visiting Defendant's brick and mortar locations.

22) Plaintiff is not able to visit the physical locations without the assistance of a family member or caretaker, so the ability to purchase merchandise on Defendant's website for delivery to his home is important to his as an alternative when he is not able to visit the Defendant's stores.

23) The Website also services Defendant's physical stores by providing information on its brand of merchandise, its collections, sales campaigns, and other information that Defendant is interested in communicating to its customers about its physical locations.

24) Since the website allows the public the ability to locate Defendant's physical stores and retail locations, sells merchandise offered for sale by Defendant from its physical stores, create an online account to receive special offers and rewards, sign up for defendant's newsletter, view collections, limited edition items, collaborative items, and start an online chat with defendant's customer service representatives, the website is an extension of, and gateway to, Defendant's physical stores. By this nexus, the website is characterized as an intangible service, privilege and advantage provided by a place of public accommodation as defined under the ADA, and thus an extension of the services, privileges and advantages made available to the general public by Defendant through its retail brick and mortar stores.

25) Because the public can view and purchase Defendant's merchandise that is also offered for sale by Defendant at its physical stores, create an online account to receive special offers and rewards, sign up for defendant's newsletter, view collections, limited edition items, collaborative items, and start an online chat with defendant's customer service representatives, the Website is an extension of and gateway to the physical stores, which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). As such, the Website, as an intangible service, privilege and advantage of Defendant's brick and mortar locations, must be fully accessible and in compliance with the ADA, must not discriminate against individuals with disabilities, and must not deny full

and equal enjoyment of the same services, privileges and advantages afforded to the general public both online and at the physical locations.

26) At all times material hereto, Defendant was and still is an organization owning and operating the Website. Since the Website is open through the internet to the public as an extension of the retail stores, by this nexus the Website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, and Defendant has subjected itself and the associated Website it created and maintains to the requirements of the ADA.

27) Plaintiff is and/or has been a customer who is interested in patronizing, and intends to patronize, Defendant's physical stores, and purchase Defendant's merchandise, sign up for Defendant's email program and make purchases both online through the Website and at Defendant's physical stores.

28) The opportunity to shop Defendant's merchandise and secure information from his home for eventual use in Defendant's physical stores are important accommodations for Plaintiff because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frustrating, confusing, and frightening experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

29) Like most consumers, Plaintiff accesses numerous websites at a time to compare merchandise and prices, sales, discounts, and rewards programs. Plaintiff may look at several dozens of sites to compare features and prices.

30) During the month of January 2020, Plaintiff attempted on several occasions to utilize the Website to browse through the merchandise and on-line offers to educate himself as to the

merchandise, sales, discounts, and promotions being offered, and with the intent to make a purchase through the Website or at one of Defendant's physical stores.

31)  Places of public accommodation are not just brick-and-mortar structures. The United States Department of Justice and the binding case law increasingly recognize that private entities are providing goods and services to the public through websites that operate as places of public accommodation under Title III.

32)  Defendant is required to make reasonable accommodations to its websites for individuals with disabilities to allow them to participate in web-based promotions and obtain goods or services via the Internet just as sighted persons are able to do.

33)  Plaintiff utilized Chrome Vox ("Screen Reader Software") to attempt to purchase the merchandise on Defendant's website. However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

34)  A person who can see can enjoy the benefits and privileges provided by Defendant's website that include, but are not limited to locating Defendant's physical stores and retail locations, selling merchandise offered for sale by Defendant from its physical stores, allowing consumer to create an online account to receive special offers and rewards, signing up for defendant's newsletter, viewing collections, limited edition items, collaborative items, and starting an online chat with defendant's customer service representatives.

35)  A person who cannot see, like the Plaintiff in this case, cannot go to Defendant's website and avail themselves of the same privileges. Thus, the Plaintiff has suffered discrimination due to Defendant's failure to provide a reasonable accommodation for Plaintiff's disability.

36) The Department of Justice has provided useful guidance regarding website accessibility under the ADA, and the binding and persuasive case law in this district has applied the Web Content Accessibility Guidelines ("WCAG") 2.0 or 2.1 to determine accessibility.

37) Defendant's website does in fact fail the following WCAG 2.0-AA Compliance standards and it does not provide sufficient alternatives to serve the equivalent purpose:

Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.2 Labels or Instructions (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 3.3.2 Labels or Instructions*.

Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.1 Error Identification (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 3.3.1 Error Identification*.

Applicable WCAG 2.0 Standard at Issue: *Standard 2.1.1 Keyboard (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.1.1 Keyboard*.

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.1 Bypass Blocks*.

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.3 Focus Order (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.3 Focus Order*.

38) Furthermore, Defendant's website does not contain accessibility assistance that would direct a visually impaired person like the Plaintiff to someone who he can contact for assistance, questions, or concerns.

39) Thus, Defendant has not provided full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations provided by and through the website, in contravention of the ADA.

40) On information and belief, Defendant is, and at all times has been, aware of the barriers to its website which prevent individuals with disabilities who are visually impaired from comprehending the information within same, and is also aware of the need to provide access to all persons who visit its site.

41) Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this Complaint, such that this suit for declaratory judgment and injunctive relief is his only means to secure adequate and complete redress from Defendant's discriminatory practices in connection with use of its website.

42) Notice to Defendant is not required because of Defendant's failure to cure the violations.

43) Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§ 2201 and 2202.

44) Plaintiff has retained the undersigned attorneys to represent his in this case, and has agreed to pay them a reasonable fee for their services.

## COUNT I – VIOLATION OF THE ADA

45) Plaintiff realleges paragraphs 1 through 44 as if set forth fully herein.

46) Defendant owns and operates the https://www.oakley.com/en-us website, and is a public accommodation subject to the ADA pursuant to 42 U.S.C. §12181(7)(E).

47) Defendant's website is inaccessible to persons with disabilities like the Plaintiff, who is visually impaired. Plaintiff was not able to enjoy full and equal access to the information and

services that Defendant has made available to the public on its website, in violation of 42 U.S.C. §12101. *et seq*, and as prohibited by 42 U.S.C. §12182 *et seq*.

48)  Defendant's website is not in compliance with the ADA.

49)  Defendant has made no reasonable accommodation for Plaintiff's disability.

50)  A cursory review of a portion of the Defendant's website revealed that the website is not accessible to persons like the Plaintiff that are visually impaired as required by law and for which there is no sufficient alternative on Defendant's website, including:

Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.2 Labels or Instructions (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 3.3.2 Labels or Instructions.*

Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.1 Error Identification (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 3.3.1 Error Identification.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.1.1 Keyboard (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.1.1 Keyboard.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.1 Bypass Blocks.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.3 Focus Order (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.3 Focus Order.*

51)  Due to Defendant's failure to provide an ADA compliant website, the Plaintiff has been injured since he has been denied full access to Defendant's website.

52)  As a result, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303 to correct the inaccessibility that leads to discrimination against visually impaired persons.

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

E. An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

H.  An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.  An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

J.  An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

K.  An award to Plaintiff of his reasonable attorney's fees, costs and expenses; and

Such other and further relief as the Court deems just and equitable.

---


[1]

## COUNT II – TRESPASS

53)   Plaintiff realleges paragraphs 1 through 44 as if set forth herein.

54) Defendant's website contains software analytics. Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

55) Plaintiff never consented to and was unaware that Defendant's website was placing software on his computer.

56) Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on his personal computer, which was done without his knowledge and consent.

57) Defendant's trespass has damaged Plaintiff by affecting the condition and value of his computer.

58) On its website, Defendant has a privacy policy that can only be accessed by clicking a barely visible section at the bottom of the page called "Privacy Policy",  providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

*HOW WE COLLECT THE INFORMATION*

*When using our Sites or our services, you may provide us with your personal information through a variety of methods, including the following: (1) via signups on our Sites, such as through the creation of an account; (2) from an online, email, retail, fax, or telephone purchase; (3) when you enter a sweepstakes, giveaway, contest, or other promotion, or complete a survey; (4) when you provide information at our stores; (5) upon contacting us, such as through customer service communications, including our online chat features; (6) upon signing up at an event; (7) upon registering a Luxottica product; (8) when you submit a business reply, product, or warranty card; (9) when you post material to the Sites, such as through product reviews; or (10) when you interact*

*with us for any other purpose. Information that you provide through the Sites can be combined with the information that we collect from you in any other way.*

*We may also collect certain information automatically when you use the Sites, as described below.*

*We may receive information about you from third parties and combine it with information you have provided to us.*

*THE INFORMATION WE COLLECT*

*When you interact with us, we may collect information that you choose to provide, such as your name, address, email address, phone number, payment information, demographic information (such as your income level and gender), date of birth, information regarding your membership with other organizations (e.g., to provide discounts), photos and recordings, and any other information you choose to provide. If you contact our customer service department, you may need to provide us with additional information so that we can respond to your questions or concerns as completely and thoroughly as possible. If you create an account with us, we collect your username and password. If you are providing delivery information or other information which is not your own, then you must have that person's permission to give us their information and for us to use and share it for the purposes specified.*

*When you make a purchase, we will collect your payment card, gift card, or other payment information. Luxottica takes reasonable steps to protect the security of payment card information such as by using tokenization, a storage technique which replaces payment card data with randomized identifiers.*

*If you apply for a job through one of our Sites, we will collect any information you provide in your application, including, but not limited to, educational background, employment history, and references.*

*Some of the affiliates and brands covered by this Policy are subject to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). These affiliates and brands may collect additional information that is considered "protected health information" ("PHI") as defined by HIPAA. When the information that we collect is considered PHI, we will handle that information in accordance with our <u>Notice of Privacy Practices</u>. Please visit that notice for information on our privacy practices, our legal duties, and your rights concerning your PHI.*

*We (or third parties operating on the Sites) also may automatically collect technical information when you use our Sites (for example, browser version, IP address, Internet service provider, referring/exit pages, operating system, date/time stamp, clickstream data and reference site domain name, and customer traffic patterns and website usage). We may use cookies or similar technology to collect this information. See the <u>"Digital Advertising & Analytics"</u> section of this Policy to learn more about the use of this information and the choices available to you.*

*HOW DO WE USE THIS INFORMATION*

*We may use the information we collect for any lawful purpose, including the following:*

*1) To process and fulfill your order, including sending you emails to confirm your order status and shipment, and to provide other related communications.*

*2) To administer a contest, promotion, survey, or other site feature, and to provide you with the relevant products or services (for instance to deliver a prize you may have won in a contest).*

*3) To send you information/materials via email or mail about products, offers, and news we think could interest you. This information may relate to products, services, offers, and news of Luxottica products or other products and services. Please see "Your Choices" below for more information.*

*4) To operate and improve the Sites, including to analyze visits to the Sites and learn about our visitors so we can operate the Sites and improve our products and services and deliver the best user experience.*

*5) To communicate with you, including responding to your inquiries.*

*6) To comply with the law and to maintain the security of our Sites.*

*7) As otherwise disclosed at the time of collection or use.*

*When you make a purchase, you can choose to save your information to obtain a faster checkout for purchases and/or you can choose to receive emails, which provide you with information regarding our other products and services.*

*SHARING INFORMATION WITH THIRD PARTIES*

*We engage service providers to perform services in connection with the operation of our business. We may share personal information with service providers so that they can perform these services. Examples of these services include payment processing and authorization, text messaging services, fraud protection and credit risk reduction, product customization, order fulfillment and shipping, marketing and promotional material distribution, website evaluation, data analysis and, where applicable, data cleansing.*

*In proceeding with your online order, you agree that any information associated with the order, such as the delivery name and address (if different from yours), will be processed using service providers.*

*Personal information collected through our Sites may be shared between the brands and affiliates that are owned or operated by Luxottica of America Inc.*

*We also share personal information with selected third parties for their own marketing purposes. See the "Your Choices" section of this Policy for more information.*

*We may release personal information if we believe in good faith that: (1) the law or legal process requires it; (2) we have received a valid administrative request from a law enforcement agency; or (3) such release is necessary or appropriate (in our sole discretion) to protect the rights, property, or safety of Luxottica, or any of our respective affiliates, service providers, customers, or others.*

*We may also share your information with your consent or as otherwise disclosed at the time of data collection or sharing.*

*As with any business, it is possible that as our business develops, we might go through a business transition, such as a merger, acquisition by another company, or the sale of all or a portion of our assets, or buying online stores or other assets, including at bankruptcy. In such transactions, information about customers will likely be transferred.*

*The Sites may allow you to provide comments in various sections of our Sites, such as in product reviews. Please be aware that the information you post in these areas may be available to visitors of the Sites and to the general public.*

*We share aggregated and de-identified information, or any other technical information, without limitation. For example, we may share aggregated demographic information about the Sites visitors with our affiliates, service providers or vendors, so that they can provide marketing analysis and consult on advertising strategies. We also may share technical information, such as the number of users who visited the Sites during a specific time period or who purchased a specific product through the Sites, with our marketing service providers, advertisers, and others from time to time. This information generally is shared in an aggregated form.*

*DIGITAL ADVERTISING & ANALYTICS*

*We may partner with ad networks and other ad serving providers ("Advertising Providers") that serve ads on behalf of us and others on non-affiliated platforms. Some of those ads may be personalized, meaning that they are intended to be relevant to you based on information Advertising Providers collect about your use of the Sites and other sites or apps over time, including information about relationships among different browsers and devices.*

*This type of advertising is known as interest-based advertising and works to use your information to make ads more useful to you. You may visit www.aboutads.info to learn more about this type of advertising and how to opt out of this advertising on websites by companies participating in the DAA self-regulatory program. If you delete your cookies or use a different browser or mobile device, you may need to renew your opt out choices exercised through the DAA tool. Note that electing to opt out will not stop advertisements from appearing in your browser or applications. It may make the ads you see less relevant to your interests. Additionally, your browser may offer tools to limit the use of cookies or to delete cookies; however, if you use these tools, our Sites may not function as intended.*

*We may also work with service providers that collect data about your use of the Sites and other sites or apps over time for non-advertising purposes subject to their privacy policies. We use analytics providers such as Google Analytics to gather and analyze aggregated anonymous user information. For more information about Google Analytics, please visit www.google.com/policies/privacy/partners/. You can opt out of Google's collection and processing of data generated by your use of the Sites by going to http://tools.google.com/dlpage/gaoptout.*

*THIRD-PARTY LINKS & PLUG-INS*

*The Sites may provide links to third-party websites or apps, including our social media pages. We do not control the privacy practices of those websites or apps, and they are not covered by this Policy. You should review the privacy policies of other websites or apps that you use to learn about their data practices.*

*The Sites may also include integrated social media tools or "plug-ins," such as social networking tools offered by third parties. If you use these tools to share information or you otherwise interact with social media features on the Sites, those social media companies may collect information about you and may use and share such information in accordance with their own policies, including by sharing such information with us or the general public. Your interactions with third-party social media companies and the use of their features are governed by the privacy policies of the companies that provide those features. We encourage you to read the privacy policies for any social media accounts you create and use.*

59)    Due to Plaintiff's disability, he could not understand Defendant's website and he could not give informed consent to Defendant's installation of data and information tracking software on his computer. Defendant also could not give informed consent to Defendant's collection of his browsing history and the placement of analytics on his computer.

60)    .    Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from his computer and determine which programs should be installed and operated on his computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

### Request for Jury Trial

61)    Plaintiff requests a jury trial.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090

Facsimile: 1-305.809.8474
Email:info@mendezlawoffices.com
By: /s/
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL 33014
Telephone: 305-824-9800
Facsimile: 305-824-3868
Email: lr1208@live.com
By: /s/
LYDIA C. QUESADA, ESQ., of Counsel
FL BAR NO.: 191647